## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Apr 05 2017, 6:54 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Jennifer L. Harmeyer
Jeffersonville, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Robert J. Henke
Abigail R. Recker
Deputy Attorneys General
Indianapolis, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In re the Termination of the Parent-Child Relationship of T.H. (Minor Child), and J.H. (Father), *Appellant-Respondent,* v. The Indiana Department of Child Services, *Appellee-Petitioner* | April 5, 2017 Court of Appeals Case No. 10A01-1608-JT-1947 Appeal from the Clark Circuit Court The Honorable Vicki L. Carmichael, Judge The Honorable Joni L. Grayson, Magistrate Trial Court Cause No. 10C04-1511-JT-22 |

**Mathias, Judge.**

[1]    The Clark Circuit Court terminated J.H.'s ("Father") parental rights to T.H., his minor child. Father appeals and raises several issues, which we restate as whether the trial court's findings were supported by the evidence and whether the trial court erred when it terminated Father's parental rights.

[2]    We affirm.

## Facts and Procedural History

[3]    T.H. was born on November 11, 2012, to Father and B.H. ("Mother"), who are married. Mother is a drug addict, and T.H. tested positive for opiates at birth. T.H., who was born in Kentucky, was removed from her parents' care because Father was homeless and Mother was a drug addict. The child was placed in foster care, and the State of Kentucky ordered Father to participate in numerous services.

[4]    T.H. was returned to Father's care on April 11, 2014, but the State of Kentucky issued a no-contact order between Mother and T.H. Mother did not participate in services and continued to use drugs. The State of Kentucky then closed its case. Shortly thereafter, Mother and Father moved to Sellersburg, Indiana.

[5]    On July 15, 2014, Mother's sister discovered twenty-month-old T.H. alone in the house. Father left T.H. in Mother's care while he was at work, and Mother left the house to get cigarettes. DCS removed T.H. from Father's care and

placed her with her maternal aunt, but she was eventually returned to the care of her former foster parents.

[6] Mother and Father admitted that T.H. was a child in need of services ("CHINS") in September 2014. Father was ordered to participate in numerous services including participation in parenting classes, counseling, and supervised visitation with T.H., and maintaining contact with his family case manager.

[7] Father initially participated in services and supervised visitation. The visitation supervisor did not have any concerns with Father's interaction with T.H. Father completed a psychological evaluation, but four of the tests were returned as invalid and could not be scored. Father does not use illegal substances, and his drug screens were negative. Father attended parenting classes but did not complete the twelve-week program.

[8] Mother was also ordered to participate in numerous services. Mother participated in some services, but also continued to use illegal substances. Mother acknowledged her substance abuse problem but refused to refrain from using illegal substances.

[9] In April 2015, Father's employment ended when the company he worked for shut down. In May 2015, Father's vehicle broke down and he did not have reliable transportation. Father's participation in services and visitation with T.H. ceased after Father no longer had a vehicle. The trial court ordered visitation with T.H. suspended in November 2015 because Father failed to

exercise visitation with T.H. from May 2015 to November 2015. Father also failed to maintain contact with his family case manager.

[10] On November 10, 2015, DCS filed a petition to terminate Mother's and Father's parental rights. Evidentiary hearings were held on the petition on March 3, April 7, April 21, and June 9, 2016. On July 27, 2016, the trial court issued an order terminating parents' parental rights. The trial court found in pertinent part:

> 4. On May 28, 2015, a permanency hearing was held . . . . Mother and Father did not appear. . . . The Court found that Father was not in compliance with the plan. Father had completed a psychological evaluation, but the majority of the results were not considered valid due to reporting by Father that was minimized. Father had attended five (5) to six (6) parenting classes. Father attended counseling on March 2, 2015, but cancelled on April 9, 2015 and no-showed on April 19, 2015. Father had clean drug screens during the report period. . . .
>
> 5. On August 20, 2015, a periodic case review hearing was held, . . . . Mother and Father failed to appear. . . . At that time, the Court also found that Father had not complied with Child's case plan. Father had not attended counseling since March 2015. Father attended five (5) to six (6) parenting classes, but had not completed the course. Father was unemployed. Father had not visited Child since May 8, 2015. Father had failed to maintain contact with the Family Case Manager since May 2015. . . . The Court found that Mother and Father had not enhanced their ability to fulfill their parental obligations, had not cooperated with DCS, and had not visited Child since May 8, 2015.
>
> 6. On November 19, 2015, a periodic case review hearing was held . . . . Mother and Father failed to appear. . . . Father was not

participating in any services, submitting to random drug screens, or maintaining contact with the Family Case Manager. He had not visited Child since May 8, 2015. . . .

7. On May 19, 2016, a permanency hearing was held . . . . Mother and Father failed to appear. . . . Mother had housing with Father. Visitation was suspended by the Court in November 2015 due to failure of the Parents to attend visitation since May of 2015. . . . Father had not participated in services, including parenting classes or counseling. Father had not maintained contact with the Family Case Manager, including updating her on his telephone number. Father had screened negative for all substances on screens he had submitted to. Father had recently obtained employment, but did not provide such information to the Family Case Manager. He continues to live with Mother. . . .

\*\*\*

76. Father failed to maintain consistent contact with [Family Case Manger] Martin, including responding to correspondences and telephone messages within a reasonable amount of time.

77. Father failed to contact FCM Martin by telephone at least once per week.

78. FCM Martin would communicate with Father via telephone calls, text messages, letters, and home visits.

\*\*\*

81. When FCM Martin did speak with Father, he would often get angry with FCM Martin and hang up the phone.

82. As of May 2015, Father stopped all contact with FCM Martin.

83. FCM Martin's telephone number and work address ha[ve] been the same for the entirety of this CHINS matter.

84. On August 24, 2015, Father stated to FCM Martin to leave him alone and not to contact him anymore.

\*\*\*

101. Father completed a psychological assessment, but the majority of the results of Father's evaluation were not considered valid and he failed to follow all the recommendations of the assessment.

\*\*\*

105. Father's results from the Incomplete Sentence Blank-Adult Form revealed a theme of blaming Mother and lack of concern for Child. Father's "responses suggest a man who likely placed too much of the blame onto his spouse for the loss of custody of his daughter. That being said, he also fears for his wife's safety and is generally concerned for her well-being. Overall, there is a lack of concern expressed for [T.H.'s] well-being."

\*\*\*

110. Dr. Sheppard summarized the following based on the psychological evaluation: "However, [J.H.] appears unwilling and unable to accept additional responsibility himself for ensuring his daughter's safety. He seems to care about her and want to be a good father, but he struggles with the specifics of how to do that. Further, there is some question about his ability

to truly connect and bond with his child. He expresses missing her, but largely from the perspective of what she provides to him (being able to hold her, having a happy family, etc.). [J.H.] clearly expresses love for his family, but might be lacking a deeper connection with his child. He might not fully understand all that is involving [sic] in taking care of and nurturing an infant/toddler. This examinee is also likely in denial about his wife's serious substance abuse issues. This can lead to enabling and denying real risks that exists [sic]."

111. Dr. Sheppard diagnosed Father with Relationship Distress with Spouse or Intimate Partner and Parent-Child Relationship Problem based upon the relationship problems presenting in the family.

***

113. Based on the psychological evaluation, Dr. Sheppard recommended the following:

   a. Father to only have access to Child if he can ensure that she will not be around Mother when she is under the influence and that Father must realize he is responsible for providing a safe and nurturing environment for Child;

   b. Father would benefit from attending Al-Anon and/or Nar-Anon;

   c. Visitation to be supervised:

   d. Family therapy to occur once Mother is actively engaged in substance abuse treatment;

   e. Father to submit to random drug screens;

f.  That those working with the family should be aware of signs of domestic violence and report any suspicious activity due to it appearing such has happened in the past:

g.  Father would benefit from hands-on parenting services; and

h.  Ongoing case management.

114. FCM Martin discussed the finding and recommendations of the psychological assessment with Father in January of 2015.

115. Father failed to follow the recommendations of the evaluation by failing to attend Al-Anon and failing to complete parenting classes offered to him.

116. On February 19, 2015, Father stated to Mother's ACP therapist, Lori Paris, that he bought drugs for Mother and provided Mother money to purchase drugs.

117. Lori Paris believed Father was enabling Mother's use.

118. Father failed to complete parenting classes and demonstrate knowledge and skills learned in the classes.

119. Father stated in FCM Martin that he did not need parenting classes.

*** 

126. Father failed to participate in individual counseling at a frequency and duration as recommended by the therapist.

***

128. FCM Martin reminded Father at a home visit on January 22, 2015 that he needed to schedule a counseling appointment to address his anger management. Father denied having an anger problem and denied needing counseling.

*** 

133. Father participated in supervised visitation with Child from July 2014 until May 2015.

134. Father was offered supervised visitation with Child on Mondays and Sundays while Child was placed in relative care from July 15, 2014 to October of 2014. Father visited Child only on Mondays.

135. After Child was placed in kinship care in October 2014, a referral for supervised visitation was made to Family Time, Inc. on October 17. 2014.

136. Family Time, Inc. provided Father fully supervised visitation with Child at a frequency of two (2) times per week for two (2) hours at each visit.

137. Father failed to attend thirteen (13) visitations from October 2014 to May 2015 . . . .

138. Father failed to attend any further visitations with Child after May 12, 2015.

139. Between May 12, 2015 to November 19, 2015 (when visits were ordered suspended by the Court due to a failure of Father to visit with Child), no visit was ever denied to Father.

140. Father stated to Melina Olivas that he stopped visiting the child because vehicle was not working properly and also stated concerns with gas money.

141. Melina Olivas provided Father resources for transportation and resources to get his vehicle fixed.

142. Melina Olivas provided Father a gas card in May of 2015 and offered him a ride to Court.

143. In late May or early June of 2015, Melian Olivas went to the home of Mother and Father to provide groceries. There was no electricity in the home at that time.

144. In late June 2015, Melina Olivas went to the home of Mother and Father to provide groceries.

145. Father never asked Melina Olivas about Child during her encounters with him after he stopped visiting Child in May 2015.

\*\*\*

151. Father has criminal history in Kentucky.

\*\*\*

164. Mother stated to Child's maternal aunt, Angela Carwile, that Father was physically abusive to her in their relationship.

165. Angela Carwile advised Mother to file a police report.

166. Mother described to Angela Carwile an incident where she had wanted money from Father for drugs, that Father made her perform sexual acts, that Father hit her while this occurred, that father put her in the basement, pinned her up, and threatened her with a machete.

167. Angela Carwile witnessed Mother with a black eye in the summer of 2014 and Mother stated Father had caused the injury.

168. In March of 2015, FCM Martin observed a photo of Mother with a black eye.

***

197. Guardian ad Litem, Michael Forsee ("GAL Forsee") agrees that it is in Child's best interest for termination of parental rights and adoption. GAL Forsee makes this recommendation due to Mother's inability to maintain sobriety, Father's enabling of Mother, Mother and Father's failure to visit Child, Mother and Father's failure to comply with any services or request from the Department of Child Services, that Mother and Father have been non-existent in Child's life for many months, and due to Child's current foster parents providing for Child and being the only parents Child has bonded with. Mother and Father failed and refused to make an appointment with GAL Forsee.

Appellant's App. pp. 22-40.

[11] The trial court then concluded that the conditions that resulted in T.H.'s removal and continued placement outside Father's home would not be remedied and that continuation of the parent-child relationship poses a threat to T.H.'s well-being. The court also concluded that termination of Father's rights

was in T.H.'s best interests. Father now appeals the order terminating his parental rights to T.H.[1]

## Discussion and Decision

[12] The purpose of terminating parental rights is not to punish parents but instead to protect their children. *In re S.P.H.*, 806 N.E.2d 874, 880 (Ind. Ct. App. 2004). Although parental rights have a constitutional dimension, the law allows for their termination when the parties are unable or unwilling to meet their responsibilities as parents. *Id*. Indeed, parental interests must be subordinated to the child's interests in determining the proper disposition of a petition to terminate parental rights. *In re G.Y.*, 904 N.E.2d 1257, 1259 (Ind. 2009).

[13] Indiana Code section 31-35-2-4(b)(2) provides that a petition to terminate parental rights must allege

> (B) that one (1) of the following is true:
>
> > (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
> >
> > (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
> >
> > (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

---

[1] The trial court also terminated Mother's parental rights, but Mother has not appealed the trial court's order.

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

[14] DCS must prove each element by clear and convincing evidence. Ind. Code § 31-37-14-2; *G.Y.*, 904 N.E.2d at 1261. However, because Indiana Code section 31-35-2-4(b)(2)(B) is written in the disjunctive, the trial court is required to find that only one prong of subsection (b)(2)(B) has been established by clear and convincing evidence. *In re A.K.*, 924 N.E.2d 212, 220 (Ind. Ct. App. 2010).

[15] Clear and convincing evidence need not establish that the continued custody of the parent is wholly inadequate for the child's very survival. *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). It is instead sufficient to show by clear and convincing evidence that the child's emotional and physical development are put at risk by the parent's custody. *Id*. If the court finds the allegations in a petition are true, the court shall terminate the parent-child relationship. Ind. Code § 31-35-2-8(a).

[16] We have long had a highly deferential standard of review in cases involving the termination of parental rights. *In re D.B.*, 942 N.E.2d 867, 871 (Ind. Ct. App. 2011). We neither reweigh the evidence nor assess witness credibility. *Id*. We consider only the evidence and reasonable inferences favorable to the trial court's judgment. *Id*. In deference to the trial court's unique position to assess the evidence, we will set aside a judgment terminating a parent-child relationship only if it is clearly erroneous. *Id*. Clear error is that which leaves us with a

definite and firm conviction that a mistake has been made. *J.M. v. Marion Cnty. Office of Family & Children*, 802 N.E.2d 40, 44 (Ind. Ct. App. 2004), *trans. denied.*

[17] Finally, where, as here, the trial court includes findings of fact and conclusions thereon in its order terminating parental rights, our standard of review is two-tiered. *S.P.H.*, 806 N.E.2d at 879. First, we must determine whether the evidence supports the findings, and, second, whether the findings support the legal conclusions. *Id.*

## The Trial Court's Findings

[18] Father argues that the trial court's findings of fact concerning his prior criminal history from the State of Kentucky and that finding of fact number 99 concerning his income are not supported by the evidence.

[19] The DCS presented certain exhibits concerning Father's criminal history to the trial court, but the exhibits were not admitted after Father objected on the grounds of relevance. However, Father himself testified concerning his criminal history, and the GAL's report discussed it as well. Tr., Vol. II, pp. 32, 37, 39, 40, 43; Ex. Vol., DCS Ex. 27. This evidence is sufficient to support the findings describing Father's criminal history.

[20] Father also challenges finding number 99, which states that "Father failed to have a legal source of income after losing his job at Swifty's gas station in spring of 2015 until obtaining current employment at AutoZone on January 29, 2016." Appellant's App. p. 30. The DCS presented evidence that Father had no income for twelve weeks between the date the gas station closed and the date

Father began collecting unemployment. Therefore, the finding is not supported by the evidence to the extent it states that Father had no income until January 29, 2016. However, as Father was employed on the date of the termination hearing, the inaccuracy in this finding does not require reversal of the trial court's judgment.

# Sufficient Evidence

[21] Next we address Father's argument that the trial court clearly erred when it concluded that there is a reasonable probability that continuation of the parent-child relationship poses a threat to T.H.'s well-being and that termination of his parental rights was in T.H.'s best interests.

## I. Threat to T.H.'s Well-Being

[22] Father argues that the trial court clearly erred when it found there is a reasonable probability that continuation of the parent-child relationship poses a threat to T.H.'s well-being. When considering subsection 31-35-2-4(b)(2)(B)(ii), the trial court must examine the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child. *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1157 (Ind. Ct. App. 2013). The trial court may consider evidence of a parent's prior history of neglect, failure to provide support, and lack of adequate housing and employment. *Id.* DCS is not required to provide evidence ruling out all possibilities of change. *Id.* Instead it needs to establish only that a "reasonable probability" exists that the parent's behavior will not change. *Id.*

[23] Father argues that the DCS failed to prove a continued threat to T.H.'s well-being because he has a stable home, he does not use illegal substances, and he appropriately cared for T.H. during supervised visitations. Father also partially complied with the services ordered and had difficulty maintaining his participation in services after he lost his job and his car broke down.

[24] However, even when Father was employed and had a working vehicle, he did not participate in all services ordered and missed several supervised visitations. He told his family case manager that he did not need parenting classes or counseling. After he lost his job and no longer had a working vehicle, in May and June 2015, DCS provided resources to Father so that he could attend supervised visitation with T.H., but Father failed to do so and has not visited with T.H. since May of 2015. He has not participated in any services since May of 2015. He also never requested information about T.H.'s welfare from DCS service providers. Father's failure to exercise his right to visit T.H. demonstrates a "lack of commitment to complete the actions necessary to preserve [the] parent-child relationship." *Lang v. Starke County Office of Family and Children*, 861 N.E.2d 366, 372 (Ind. Ct. App. 2007).

[25] Father is still married to Mother, who admits to abusing illegal substances. DCS also presented evidence that Father enables Mother's drug use, and Mother admitted she will continue to use illegal substances. Before T.H. was removed from Father's care, Father allowed Mother to care for T.H. even though Mother is a drug addict. For all these reasons, we conclude the trial court's conclusion that there is a reasonable probability that continuation of the

parent-child relationship poses a threat to T.H.'s well-being is supported by the evidence.[2]

## II. T.H.'s Best Interests

In determining the best interests of a child, the trial court must look beyond the factors identified by DCS and consider the totality of the evidence. *In re J.S.*, 906 N.E.2d 226, 236 (Ind. Ct. App. 2009). "In so doing, the trial court must subordinate the interests of the parent to those of the child." *Id*. Children have a paramount need for permanency, which our supreme court has deemed a central consideration in determining a child's best interests. *In the Matter of E.M.*, 4 N.E.3d 636, 647-48 (Ind. 2014). Courts "need not wait until a child is irreversibly harmed such that the child's physical, mental, and social development is permanently impaired before terminating the parent-child relationship." *Id.* at 648 (citation omitted). We have previously determined that the testimony of the case worker or guardian ad litem regarding the child's need for permanency supports a finding that termination is in the child's best interests. *McBride v. Monroe Cty. Office of Family & Children*, 798 N.E.2d 185, 203 (Ind. Ct. App. 2003).

---

[2] Father also argues that there was insufficient evidence to support the trial court's conclusion that there is a reasonable probability that that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied. Indiana Code section 31-35-2-4(b)(2)(B) is written in the disjunctive and requires clear and convincing evidence of only one of the circumstances listed in subsection (B). *See R.J. v. Ind. Dep't. of Child Servs.*, 56 N.E.3d 729 (Ind. Ct. App. 2016). Therefore, we need not address this argument.

Here, the GAL testified that termination of Father's parental rights was in T.H.'s best interests. Tr. pp. 96, 100-01. On the date of the final termination hearing, T.H. had been in Father's care for only three of her forty-three months of life. At the time of that hearing, Father had not seen, much less cared for, T.H. in over a year. Moreover, Father and Mother are still married, and Father has historically enabled Mother's illegal substance abuse. T.H. deserves the permanency and stability she now has with her foster family, and her foster parents wish to adopt her.[3]

For these reasons and those expressed in the trial court's termination order, we conclude that the trial court's finding that termination of Father's parental rights to T.H. is in her best interests is supported by clear and convincing evidence.

## Conclusion

Clear and convincing evidence supports the trial court's order terminating Father's parental rights to T.H.

Affirmed.

Kirsch, J., and Altice, J., concur.

---

[3] Father also argues that the DCS did not prove that it has a satisfactory plan for the care and treatment of T.H. Adoption by the foster parents, who have taken care of T.H. most of her life is a more than satisfactory plan for her care and treatment. The fact that the foster parents inquired about T.H.'s welfare after they learned that she was returned to Father's care does not negate their suitability as adoptive parents.